# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RACHEL SCOTT and DORA IG-IZEVBEKHAI, <br><br> Plaintiffs, <br><br> v. <br><br> THE MINNESOTA BOARD OF PHARMACY; JILL PHILLIPS, in her official capacity as Executive Director of the Minnesota Board of Pharmacy; AARON PATTERSON, in his official capacity as Interim Executive Director of the Minnesota Board of Pharmacy; RONDA MARIE CHAKOLIS-HASSAN, in her official capacity as President of the Minnesota Board of Pharmacy; KENDRA METZ, in her official capacity as Vice President of the Minnesota Board of Pharmacy; JAMES BIALKE, in his official capacity as member of the Minnesota Board of Pharmacy; AMY PARADIS, in her official capacity as member of the Minnesota Board of Pharmacy; BEN MAISENBACH, in his official capacity as member of the Minnesota Board of Pharmacy; MICHAEL HAAG, in his official capacity as member of the Minnesota Board of Pharmacy; JOHN M. ZWIER, in his official capacity as member of the Minnesota Board of Pharmacy; BARBARA DROHER KLINE, in her official capacity as member of the Minnesota Board of Pharmacy; BRANDON ORDWAY, in his official capacity as member of the Minnesota Board of Pharmacy; WALGREEN, CO. d/b/a WALGREENS, <br><br> Defendants. | Court File No. 25-3347 <br><br><br><br> **COMPLAINT** <br><br> **DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.    Plaintiffs Dora Ig-Izevbekhai and Rachel Scott are pharmacists who have sincere religious objections to dispensing medical interventions to facilitate gender transitions. For many years, Plaintiffs simply referred such prescriptions to other pharmacists for prompt filling.

2.    That ended when Defendant Walgreens, where they both worked, abruptly informed Plaintiffs that such an accommodation was illegal under Minnesota law, as administered by the state Board of Pharmacy. The result was that Walgreens fired Dr. Scott and drastically reduced Dr. Ig-Izevbekhai's hours and compensation.

3.    Walgreens was wrong about the law. Minnesota administrative rules require pharmacists to dispense or compound only those drugs that "may reasonably be expected to be compounded or dispensed in pharmacies by pharmacists." Reasonable people understand that not every pharmacist or pharmacy sells every drug, for various reasons including supply shortages, insurance reimbursement rates, lack of demand in the community—or a pharmacist's conscientious objections.

4.    Plaintiffs asked the State Board of Pharmacy to clarify that this is the correct interpretation of the Board's rules. The Board refused, leaving Plaintiffs and other pharmacists like them in legal limbo and subject to adverse actions from employers like Walgreens.

5.     To any extent that Minnesota law *does* purport to require Plaintiffs to violate their religious convictions by dispensing or compounding certain drugs, it violates the Free Exercise Clause of the U.S. Constitution and the free exercise protections of Minnesota's Constitution. Forcing individual pharmacists to violate their religious beliefs by dispensing drugs that are readily available from many other pharmacists is not narrowly tailored to advance any compelling government interest. Moreover, Minnesota permits many non-religious exceptions to any "must dispense" requirement, including for economic reasons and based on a pharmacist's professional judgment about the risks and efficacy of a prescription. Refusing to allow religious accommodations therefore is neither neutral nor generally applicable.

6.     The Court therefore should declare that Minnesota law permits Walgreens to accommodate the religious convictions of Plaintiffs and other pharmacists like them.

7.     In the alternative, the Court should declare that Minnesota's regulations of pharmacists are unconstitutional insofar as they require Plaintiffs to dispense drugs in violation of their religious convictions, and enjoin Defendants from enforcing them to that effect.

8.     In either event, the Court should additionally award Dr. Ig-Izevbekhai damages, back pay, front pay, and all other available monetary relief against Walgreens for its unlawful failure to accommodate her religious

beliefs, and should enjoin Walgreens to restore Dr. Ig-Izevbekhai to the position she enjoyed prior to Walgreens' denial of her religious accommodation, or its substantial equivalent.

## THE PARTIES

9.    Plaintiff Dora Ig-Izevbekhai is a resident and citizen of Woodbury, Minnesota, in this Distrct. She has maintained an active pharmacy license in Minnesota since 1998.

10.    Plaintiff Rachel Scott a resident and citizen of Mahtomedi, Minnesota, in this District. She has maintained an active pharmacy license in Minnesota since 2015.

11.    Defendant Walgreen Co., doing business as Walgreens, is an American pharmacy store chain headquartered in Illinois. It operates drugstores with pharmacy facilities throughout the United States, including in Minnesota.

12.    Defendant Minnesota Board of Pharmacy is an executive branch agency for the State of Minnesota, with its principal office in Saint Paul. The Board regulates pharmacists and pharmacies in Minnesota, including by approving licenses or registrations for individual pharmacists or businesses, and by deciding whether to take disciplinary actions.

13.    Defendant Jill Phillips was the Executive Director of the Board from 2022 through at least February 2025, and is currently on leave. She is

sued in her official capacity. Her successors to the position of Executive Director are also sued in their official capacity.

14. Defendant Aaron Patterson is the Interim Executive Director of the Board. He is sued in his official capacity. His successors to the position of Interim Executive Director, if any, are also sued in their official capacity.

15. Defendant Ronda Marie Chakolis-Hassan is the President of the Board. She is sued in her official capacity. Her successors to the position of President are also sued in their official capacity.

16. Defendant Kendra Metz is the Vice President of the Board. She is sued in her official capacity. Her successors to the position of Vice President are also sued in their official capacity.

17. Defendants James Bialke, Amy Paradis, Ben Maisenbach, Michael Haag, John M. Zwier, Barabara Droher Kline, and Brandon Ordway are members of the Board. Each is sued in his or her official capacity. Their respective successors to the Board are also sued in their official capacities.

18. All of the non-Walgreens Defendants are collectively referred to as "the Board Defendants."

## JURISDICTION AND VENUE

19. This case raises claims under First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §1983, and 42 U.S.C. §§ 2000e-(j) and 2000e-2 ("Title VII"). This Court therefore has subject matter jurisdiction

pursuant to 28 U.S.C. §§1331 and 1343.

20.     This case also raises claims under Minnesota law that are so re-
lated to other claims in the action within this Court's original jurisdiction that
they form part of the same case or controversy. This Court therefore has sub-
ject matter jurisdiction over those claims pursuant to 28 U.S.C. §1367.

21.     This Court has both general and specific jurisdiction over the
Board Defendants pursuant to 28 U.S.C. §1391(c)(1) and (c)(2) because all
Board Defendants reside within this District and their acts alleged herein took
place in this District.

22.     This Court has general personal jurisdiction over Defendant
Walgreens because Walgreens consented to general personal jurisdiction by
registering to do business in Minnesota and registering an authorized agent
for service of process in Minnesota pursuant to Minnesota state law.

23.     This Court also has general personal jurisdiction over Walgreens
because Walgreens conducts significant business within Minnesota and there-
fore had a continuous and systematic presence here, as well as sufficient con-
tacts within the District of Minnesota to justify the exercise of jurisdiction over
it.

24.     This Court has specific personal jurisdiction over Defendant
Walgreens because Walgreens' acts and omissions alleged herein took place in
Minnesota, or were deliberately targeted at Minnesota and at Plaintiffs within

Minnesota.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) and 42 U.S.C. §2000e-5(f)(3) because the events giving rise to this action, including the unlawful employment practice, occurred in this District.

## PLAINTIFF RACHEL SCOTT

26.     Dr. Scott was first hired by Walgreens in 2007 as a pharmacy technician.

27.     After completing pharmacy school and passing her Minnesota pharmacy licensing exams in 2015, Dr. Scott continued working for Walgreens in Minnesota as a pharmacist in the Twin Cities area.

28.     Dr. Scott started working as a staff pharmacist at Walgreens store #6056 in Woodbury, Minnesota in 2017.

29.     Throughout her time at Walgreens, Dr. Scott has received positive performance reviews and positive feedback from her supervisors and clients.

### *Dr. Scott's religious beliefs and practices*

30.     Dr. Scott is a Christian and her faith is very important to her. She attends church regularly and strives to glorify God and follow the Bible in every area of her life.

31.     As part of her religious faith, Dr. Scott believes that abortion ends a human life, that abortion therefore is murder and deeply sinful, and that she must not cooperate with or facilitate abortion.

7

32.    Therefore, as a matter of religious faith and practice, Dr. Scott does not dispense or compound drugs that she knows will be used for the purpose of causing abortions.

33.    As part of her religious faith, Dr. Scott additionally believes that God created human beings as male and female to complement each other, that attempting to medically alter a person's biological sex contradicts God's design, and that she therefore must not cooperate with or facilitate such efforts.

34.    Therefore, as a matter of religious faith and practice, Dr. Scott does not dispense or compound drugs that she knows will be used for the purpose of changing, obscuring, or transitioning a person's biological sex or gender.

35.    Dr. Scott strongly believes as a matter of her religious faith that, if she were to dispense or compound drugs in violation of these convictions and practices, she would be harming the person seeking the prescription from her.

36.    Dr. Scott's religious objections to facilitating abortion or gender transitions require only that she refrain from filling prescriptions when it is clear from the prescription itself, or from other information she has already otherwise received, that the prescription is for one of those purposes. When the purpose for a prescription is uncertain or ambiguous, Dr. Scott's religious objections to facilitating abortion or gender transitions do not prevent her from filling it, nor do they require her to make any inquiry to determine whether its purpose contradicts her faith.

37.     Dr. Scott has no religious objection to filling any other prescriptions for transgender or gender-nonconforming people. Although she refers all customers seeking drugs for purposes of abortion or gender transition to other pharmacists, Dr. Scott fills all other prescriptions presented to her on the same empathetic and compassionate terms for all patients, regardless of their sex or gender identity.

### *Walgreens informally accommodated Dr. Scott for many years.*

38.     In her 17 years of practice in Walgreens pharmacies, Dr. Scott never had to violate her religious convictions on these issues. During that time, if she was presented with a prescription that she was unable to fill because of her religious beliefs, she would arrange for another pharmacist to fill the prescription in a timely manner.

39.     Oftentimes, this was as simple as immediately handing a prescription off to another pharmacist who was working next to Dr. Scott in the same Walgreens.

40.     At times when Dr. Scott was the only pharmacist present in a store, if a prescription that she could not fill was submitted by telephone or electronically, Dr. Scott would simply schedule the prescription to be filled immediately when her shift ended and the next pharmacist's shift began. She would proactively contact the patient to tell them when the prescription would be ready. As is customary for all prescriptions, an automated message would

then be sent to the client when the prescription was ready for pickup.

41.    Dr. Scott preferred working at 24-hour Walgreens stores, in order to ensure that, if such a prescription came in while she was the only pharmacist on duty, another pharmacist would soon come in who could fill it.

42.    Dr. Scott's co-workers knew of her religious beliefs, and the staff worked together as friends to handle filling prescriptions that Dr. Scott objected to.

43.    In rare situations that Dr. Scott was the only pharmacist on duty when a Walgreens customer came to pick up a prescription that hadn't been processed yet or to request an expedited processing time, and only in those situations, would Dr. Scott's conscientious abstention from filling certain prescriptions potentially require a customer to go to a different pharmacy or return to Walgreens during the next pharmacist's shift.

44.    No client was ever prevented from receiving a prescription in a timely manner because of Dr. Scott's religious beliefs.

45.    No client ever complained about Dr. Scott's religious practices.

46.    In 17 years of Dr. Scott's work at Walgreens, these religious practices of hers did not result in any formal or informal client complaints with the State Board of Pharmacy.

### *Walgreens refused to formally accommodate Dr. Scott.*

47.    While Dr. Scott was on maternity leave in 2023, she reflected and

10

grew in her faith, and concluded that she should ask Walgreens to formalize the informal religious accommodations she had been using for 16 years.

48.    Because of this, when Dr. Scott returned to work from maternity leave in May 2023, she submitted a request for a religious accommodation to her pharmacy manager.

49.    Dr. Scott's accommodation request explained her religious beliefs, as described above, and asked that she be allowed to continue doing what she had always done: politely refer requests that conflicted with her religious beliefs to a willing pharmacist.

50.    Walgreens responded that Minnesota law does not allow pharmacists to decline to dispense gender-transition drugs on religious grounds, and that Walgreens therefore would not accommodate Dr. Scott's request in that regard.

51.    On December 2, 2023, Walgreens informed Dr. Scott that unless she was willing to violate her faith and fill prescriptions for gender-transition drugs, she would not be scheduled to work at Walgreens after January 3, 2024.

52.    During the six months between her religious-accommodation request and her last day at Walgreens, Dr. Scott continued to practice her faith, did not fill prescriptions in conflict with her faith, and was not required by Walgreens to do so.

## PLAINTIFF DORA IG-IZEVBEKHAI

53.    Dr. Ig-Izevbekhai was hired by Walgreens in 1996 as a pharmacy technician and soon after as a graduate intern.

54.    After passing her Minnesota pharmacy licensing exams in 1998, Dr. Ig-Izevbekhai continued working for Walgreens in Minnesota as a pharmacist in the Twin Cities metro area.

55.    In addition to holding a doctorate degree in Pharmacy, Dr. Ig-Izevbekhai is a Board-Certified Ambulatory Care Pharmacist, which allows her to work as an Ambulatory Care Preceptor for fourth-year pharmacy students at several universities.

56.    Dr. Ig-Izevbekhai started working as a staff pharmacist at Walgreens store #03122 in Oakdale, Minnesota in 2008.

57.    Throughout her time at Walgreens, Dr. Ig-Izevbekhai has always received positive performance reviews in addition to positive feedback from her supervisors and from clients.

58.    On several occasions, clients have called to report that Dr. Ig-Izevbekhai served them well and cared for them compassionately.

### *Dr. Ig-Izevbekhai's sincerely held religious beliefs*

59.    Dr. Ig-Izevbekhai is a Bible believing and practicing Christian. Her faith is very important to her. Dr. Ig-Izevbekhai attends church regularly and attempts to live out her faith at home and at work.

60.     Since Dr. Ig-Izevbekhai become a Christian, her empathy and patience with clients and co-workers have grown. Dr. Ig-Izevbekhai's faith has given her extra patience because she believes that God is patient with her.

61.     Dr. Ig-Izevbekhai's Christian faith tells her that each person is indispensable and valuable. As a result, she feels called not just to fulfill people's need for medicine, but to care for the whole person.

62.     Indeed, Dr. Ig-Izevbekhai believes that God instructs that each person's body is the temple of the Holy Spirit and is therefore not to be defiled or destroyed.

63.     Therefore, as a matter of religious faith and practice, Dr. Ig-Izevbekhai does not provide or sell alcoholic beverages or tobacco products to anyone.

64.     Dr. Ig-Izevbekhai further believes, as a matter of religious faith, that abortion ends a human life and is murder, and that she therefore must not cooperate with or facilitate an abortion, either before or after it occurs.

65.     Therefore, as a matter of religious faith and practice, Dr. Ig-Izevbekhai does not dispense or compound drugs that she knows will be used for the purpose of causing abortions, and does not dispense or administer vaccines that were made using tissue from aborted fetuses.

66.     Dr. Ig-Izevbekhai became aware in the early 2020s that some vaccines were made using tissue taken from aborted fetuses. Since that time, as a

matter of religious faith and practice, Dr. Ig-Izevbekhai does not administer these vaccines.

67.    Dr. Ig-Izevbekhai has researched various vaccines' provenance in order to determine whether her religious beliefs permit her to administer them. The list of approved vaccines and their manufacturing methods changes from time to time, as has Dr. Ig-Izevbekhai's knowledge of these matters, but currently, Dr. Ig-Izevbekhai refrains as a matter of religious faith and practice from administering the MMR vaccine, the rabies vaccine, the varicella (chickenpox) vaccine, and one particular brand of the hepatitis A vaccine.

68.    As part of her religious faith, Dr. Ig-Izevbekhai additionally believes that God created human beings as male and female to complement each other, that attempting to medically alter a person's biological sex contradicts God's design, and that she therefore must not cooperate with or facilitate such efforts.

69.    Therefore, as a matter of religious faith and practice, Dr. Ig-Izevbekhai does not dispense or compound drugs that she knows will be used for the purpose of changing, obscuring, or transitioning a person's biological sex or gender.

70.    Dr. Ig-Izevbekhai strongly believes as a matter of her religious faith that, if she were to dispense or compound drugs in violation of these religious convictions and practices, she would be harming not only herself but also

14

the person seeking the prescription from her.

71.    Dr. Ig-Izevbekhai's religious objections to facilitating abortion or gender transitions require only that she refrain from filling prescriptions when it is clear from the prescription itself, or from other information she has already otherwise received, that the prescription is for one of those purposes. When the purpose for a prescription is uncertain or ambiguous, Dr. Ig-Izevbekhai's religious objections to facilitating abortion or gender transitions do not prevent her from filling it, nor do they require her to make any inquiry to determine whether its purpose contradicts her faith.

72.    Dr. Ig-Izevbekhai has no religious objection to filling any other prescriptions for transgender or gender-nonconforming people. Although she refers all customers seeking drugs for purposes of abortion or gender transition to other pharmacists, Dr. Ig-Izevbekhai fills all other prescriptions presented to her on the same empathetic and compassionate terms for all patients, regardless of their sex or gender identity.

### Walgreens knew of and informally accommodated Dr. Ig-Izevbekhai's religious beliefs for over a decade.

73.    In her 27 years of practice in Walgreens pharmacies, Dr. Ig-Izevbekhai never had to violate her religious convictions on these issues. During that time, if she was presented with a prescription or vaccine request that she was unable to fill because of her religious beliefs, she would arrange for

another pharmacist to fill the prescription in a timely manner.

74.    Oftentimes, this was as simple as immediately handing a prescription or vaccine request off to another pharmacist who was working next to Dr. Ig-Izevbekhai in the same Walgreens.

75.    At times when Dr. Ig-Izevbekhai was the only pharmacist present in a store, if a prescription that she could not fill was submitted by telephone or electronically, Dr. Ig-Izevbekhai would simply schedule the prescription to be filled as soon as her shift ended and the next pharmacist's shift began. As is customary for all prescriptions, the customer would receive an automated notification when the prescription was ready for pickup.

76.    Customers rarely made appointments for vaccines that Dr. Ig-Izevbekhai could not administer. On the few occasions a customer did, Dr. Ig-Izevbekhai's coworkers would cooperate with her and administer the vaccine.

77.    Dr. Ig-Izevbekhai sought out 24-hour Walgreens stores or Walgreens stores where multiple pharmacists were regularly scheduled to work at, in order to minimize the time it took to fill prescriptions or make vaccine appointments in these circumstances.

78.    Dr. Ig-Izevbekhai's co-workers knew of her religious beliefs, and the staff worked together as friends to handle filling prescriptions that Dr. Ig-Izevbekhai objected to.

79.    It was an unusual occurrence for Dr. Ig-Izevbekhai's religious

16

convictions to require a customer to go to a different pharmacy or return to Walgreen's during the next pharmacist's shift. This happened only if she was the only pharmacist on duty when a customer presented for the first time in the store a prescription or refill request that she could not fill, or a walk-in customer without an appointment requested a vaccine that she could not administer.

80.    As early as 2012, Dr. Ig-Izevbekhai's Walgreens pharmacy manager contacted her directly and discussed her objections to filling prescriptions for abortion drugs.

81.    Neither in 2012 nor for many years thereafter did Walgreens object to, or require Dr. Ig-Izevbekhai to change, her referral practices described above.

82.    No client was ever prevented from receiving a prescription in a timely manner because of Dr. Ig-Izevbekhai's religious beliefs.

83.    No client ever complained about Dr. Ig-Izevbekhai's religious practices.

84.    In 27 years of Dr. Ig-Izevbekhai's work at Walgreens, these religious practices of hers did not result in any formal or informal client complaints with the State Board of Pharmacy.

85.    Dr. Ig-Izevbekhai's religious objections to selling or providing tobacco products or alcoholic beverages were never an issue for her work at

Walgreens. Minnesota Walgreens do not sell alcohol, and on the rare occasion Dr. Ig-Izevbekhai was asked to facilitate the purchase of cigarettes, she could easily ask another pharmacist or cashier to help the customer.

### *Walgreens suddenly decided not to accommodate Dr. Ig-Izevbekhai.*

86.    In November or December 2022, Dr. Ig-Izevbekhai's pharmacy manager asked her to fill out a Walgreen's religious exemption form, listing any and all job duties she would like an accommodation from.

87.    At that same time, Dr. Ig-Izevbekhai's store manager said that Dr. Ig-Izevbekhai was a good employee who Walgreens did not want to lose.

88.    Dr. Ig-Izevbekhai filled out the form and submitted it to her store manager as instructed by her pharmacy manager.

89.    Attached as **Exhibit A** is Dr. Ig-Izevbekhai's completed religious accommodation form. The form explains Dr. Ig-Izevbekhai's religious convictions described above, and proposed that she continue doing what she had always done: politely refer requests that conflicted with her religious beliefs to a willing pharmacist.

90.    After submitting this form, Dr. Ig-Izevbekhai continued to serve Walgreens clients in the same manner as she previously had, without any incident or complaint.

91.    After Dr. Ig-Izevbekhai submitted this form, Joshua Mitchell, her Walgreens district manager at the time, asked her to have several meetings

with himself and other Walgreens representatives.

92.    At the very first of those meetings, Mr. Mitchell told Dr. Ig-Izevbekhai that her requested accommodation was denied and that she would be unable to continue working as a pharmacist at Walgreens unless she agreed to violate her religious beliefs.

93.    In those meetings, Dr. Ig-Izevbekhai tried to propose the same accommodation that she had been using for years.

94.    Despite this, around April 2023, Mr. Mitchell formally notified Dr. Ig-Izevbekhai that her accommodation request was denied.

95.    Specifically, Mr. Mitchell told Dr. Ig-Izevbekhai that Minnesota's Board of Pharmacy allowed pharmacists to object on religious grounds only to filling prescriptions for emergency contraceptives and abortifacients, and that Walgreens therefore would not accommodate Dr. Ig-Izevbekhai's religious practice of not providing gender-transition drugs.

96.    Dr. Ig-Izevbekhai asked Mr. Mitchell about the other aspects of her accommodation request, beyond her objection to filling prescriptions for gender-transition drugs.

97.    Mr. Mitchell's response was that his superiors at Walgreens had asked him only to address the issue about gender-transition drugs with her.

98.    Walgreens has never told Dr. Ig-Izevbekhai, formally or informally, that it could not accommodate her objections to administering vaccines

made from fetal tissues, or that it was taking any adverse employment action against her because of those objections.

### *Walgreens bars Dr. Ig-Izevbekhai*
### *from dispensing medicines in Minnesota.*

99.    Near the end of December 2023, Walgreens informed Dr. Ig-Izevbekhai that unless she agreed to violate her faith and fill prescriptions for gender-transition drugs, she would not be scheduled to work as a Walgreens pharmacist after January 3, 2024.

100.    Dr. Ig-Izevbekhai, through legal counsel, sent a letter to Walgreens asking Walgreens again to accommodate her religious beliefs and practices.

101.    Walgreens did not respond to this letter.

102.    Between the time Dr. Ig-Izevbekhai made her religious accommodation request and her last day as a staff pharmacist—a period of nearly 12 months—Walgreens continued to schedule her for work as a pharmacist, and she continued to work without filling prescriptions or administering vaccines that conflicted with her faith.

103.    Since January 3, 2024, Walgreens has allowed Dr. Ig-Izevbekhai to work in Minnesota only in a part-time position training intern pharmacy students.

104.    This amounts to usually only 1 day (8 hours) and occasionally up

to 2 days (16 hours) a week of work in Minnesota.

105.   In January 2024, Mr. Mitchell warned Dr. Ig-Izevbekhai that this training work did not allow her to do any non-training work in the pharmacy, even if someone asked for her help.

106.   Mr. Mitchell also told Dr. Ig-Izevbekhai that Walgreens was closing another Minnesota pharmacy due to a lack of staff, but that she could not work as a pharmacist at that location.

107.   In early 2024, with her working hours and pay drastically reduced, Dr. Ig-Izevbekhai used up almost all of her saved vacation time to make ends meet.

108.   In February 2024, Dr. Ig-Izevbehkai was able to obtain a temporary license to practice pharmacy in Wisconsin.

109.   Walgreens agrees that Wisconsin law allows accommodation of Dr. Ig-Izevbekhai's religious beliefs and practices.

110.   Therefore, since February 2024, Walgreens has allowed Dr. Ig-Izevbekhai to work part-time hours at Wisconsin Walgreens drugstores near her home in Woodbury, Minnesota, under an accommodation similar to the one she previously used in Minnesota.

111.   Walgreens similarly has allowed Dr. Ig-Izevbekhai to work full-time hours at Wisconsin Walgreens drugstores that are an approximately an hour's drive from her home.

112.   To maintain this Wisconsin working arrangement beyond her six-month temporary licensure, Dr. Ig-Izevbekhai was required to obtain a permanent Wisconsin pharmacy license, at a cost to her of about $800 and substantial time and effort preparing for and taking the licensure exam.

113.   Because her Wisconsin work at Walgreens is either part-time or too far from her home to commute to every day, Dr. Ig-Izevbekhai has been forced to find additional part-time work in non-dispensing roles at another Minnesota health company.

114.   After Walgreens seriously reduced her hours, Dr. Ig-Izevbekhai timely filed a Charge of Discrimination in the Equal Employment Opportunity Commission.

115.   In response, Walgreens' EEOC position statement confirmed that the principal, if not the only, reason Walgreens could not accommodate Dr. Ig-Izevbekhai's religious practices in Minnesota is the state Board of Pharmacy's supposed requirement that all pharmacists must dispense gender-transition drugs and administer all vaccines.

116.   Upon information and belief, Walgreens has, at least informally, offered accommodations to other pharmacists at other Minnesota stores who have similar religious beliefs or conscientious objections to dispensing the same products.

117.   Walgreens' EEOC position statement also asserted, for the first

time, that Dr. Ig-Izevbekhai's requested accommodation from administering vaccines made with fetal tissues was, according to Walgreens, also prohibited by the Board's rules.

118. Dr. Ig-Izevbekhai received a right-to-sue letter from the EEOC on May 27, 2025, attached as **Exhibit B.**

### THE BOARD OF PHARMACY'S "REASONABLY EXPECTED" REGULATION AND ITS MANY EXCEPTIONS

119. The Board is made up of "three public members … and six pharmacists," all appointed by the Governor. Minn. Stat. §§151.02-03. The Board regulates the practice of pharmacy in Minnesota by, among other things, licensing all pharmacists and pharmacies, writing and adopting rules for them, and offering guidance about rules and laws that it enforces. Minn. Stat. §§151.06, 214.108; Minn. R. 6800.0300.

120. The Board has authority to discipline "a pharmacist … [who] engag[es] in unprofessional conduct as specified in the board's rules." Minn. Stat. §§151.06, subd. 1(7), 151.071, subd. 2(12). Discipline may involve revocation, suspension, or limitation of a license, as well as and civil penalties of up to $10,000 per violation. Minn. Stat. §157.071, subd. 1.

121. Violators of Minnesota's statutes regulating the practice of pharmacy may also be guilty of a misdemeanor, Minn. Stat. §151.29, punishable by up to 90 days in jail, a $1,000 fine, or both, Minn. Stat. §609.02, subd. 3.

122.   By rule, the Board defines unprofessional conduct by a pharmacist as "[r]efusing to compound or dispense prescription drug orders that may reasonably be expected to be compounded or dispensed in pharmacies by pharmacists, except as provided for in Minnesota Statutes, sections 145.414 and 145.42." Minn. R. 6800.2250, subp. 1(C).

123.   Minnesota Statutes 145.414 and 145.42 provide that no one may be penalized or prejudiced for refusal to assist in or accommodate an abortion.

124.   The plain language of the regulation simply provides that a pharmacist may not unreasonably refuse to dispense or compound a prescription drug order. It does not create any requirement that every pharmacist fill every prescription, even for relatively common medications.

125.   Indeed, from 1999 until the present, the Board has interpreted its rules to allow accommodations for pharmacists who "because of their personal beliefs, refuse to fill certain prescriptions, such as those for the recently marketed 'morning-after' pill." In 1999 the Board explained that, instead of filling prescriptions in violation of their convictions, pharmacists could make arrangements to refer such prescriptions to "another staff person or … another pharmacy." Attached as **Exhibit C** are the Board's Minutes from this 1999 meeting.

126.   These accommodations that the Board contemplates are very similar to the ones that Dr. Scott and Dr. Ig-Izevbekhai had informally engaged

with their Walgreen's colleagues for many years.

127.   This requirement by its terms applies only to "compound[ing] or fill[ing] prescription drug orders." Neither this rule nor any other purports to create an obligation on the part of any pharmacist to administer any vaccine.

128.   Consistent with the rule's "may reasonably be expected" standard, the Board allows for multiple non-religious reasons why pharmacists or pharmacies may reasonably and lawfully decline to dispense or compound medications.

129.   It is quite common, for instance, for pharmacists to decline to fill prescriptions when customers present insurance that the pharmacy does not accept.[1]

130.   Similarly, a significant number of relatively common medications are reimbursed at such low rates by health-insurance plans that many pharmacies would lose money by carrying and selling them. At various times in recent years, large numbers of pharmacies, including pharmacies in Minnesota, have chosen not to carry some or all of these drugs for economic reasons.[2]

---

[1] *See* Brief of National and State Pharmacists Association as *Amici Curiae* Supporting Petitioners, *Stormans, Inc. v. Wiesman*, 2016 U.S. S. Ct. Briefs LEXIS 570, at *25 (Feb. 5, 2016).

[2] *See Independent Pharmacies Reluctant to Stock Drugs in Medicare Negotiation Program, New Survey Shows*, Nat'l Community Pharmacist Assoc. (Oct. 15, 2024), https://ncpa.org/newsroom/news-releases/2024/10/15/independent-pharmacies-reluctant-stock-drugs-medicare-negotiation; *Survey Finds 30% of Independent Pharmacies Will Not Stock Certain IRA-Negotiated Drugs*, Aimed

131.   Far from treating pharmacists as behaving unprofessionally when they decline to fill prescriptions for insurance or economic reasons, the Minnesota Board of Pharmacy specifically permits a pharmacy to transfer a prescription order to another pharmacy to be filled or refilled. Minn. R. 6800.3120.

132.   Similarly, few pharmacies are able to carry every medication approved for medical use, and most pharmacies stock only a small fraction of all possible prescription medications at any given time.[3]

133.   As to vaccines, Walgreens itself offers only a limited number of vaccines at its pharmacies, which does not include all vaccines on the Center for Disease Control's vaccination schedule.[4]

---

Alliance (Feb. 7, 2025), https://aimedalliance.org/survey-finds-30-of-independent-pharmacies-will-not-stock-certain-ira-negotiated-drugs/; Gordon Severson, *Independent pharmacists plead their case at Minnesota State Capitol after mass closures in recent years*, Kare11 (May 14, 2025), https://www.kare11.com/article/news/local/independent-pharmacists-plead-case-at-minnesota-state-capitol-mass-closures/89-53a3d92f-6856-4d71-8613-5d82dc488dff.

[3] Freedom of Conscience for Small Pharmacies: Hearing Before the H. Comm. on Small Business, 109th Cong. 66-67 (2005) (testimony of the American Pharmacists Association), https://www.govinfo.gov/content/pkg/CHRG-109hhrg22612/pdf/CHRG-109hhrg22612.pdf; Robin Fretwell Wilson, *The Limits of Conscience: Moral Clashes over Deeply Divisive Healthcare Procedures*, 24 Am. J. L. & Med. 41, 53-54 (2008).

[4] *Compare Vaccines available at Walgreens*, Walgreens, https://www.walgreens.com/topic/pharmacy/immunization-services-appointments.jsp#, *with Child and Adolescent Immunization Schedule by Age*, Center for Disease Control, https://www.cdc.gov/vaccines/hcp/imz-schedules/child-adolescent-age.html.

134.   Upon information and belief, some pharmacies in Minnesota do not stock or offer vaccines at all.

135.   Pharmacies make all of these stocking decisions based on their predictions of which drugs will be most needed in their communities—and if a pharmacy predicts incorrectly and therefore fails to stock or dispense a drug that winds up being widely needed, the Board rarely if ever treats that as unprofessional conduct.

136.   The Board also expressly permits a pharmacist to "refuse to fill or refill a prescription if, in the pharmacist's professional judgement, there is a question as to the drug's safety and/or efficacy."[5]

137.   Pursuant to this rule, pharmacists in Minnesota refused to fill prescriptions for Ivermectin and Hydroxychloroquine during the COVID-19 pandemic.[6]

## THE BOARD REFUSED TO CLARIFY THE APPLICATION OF ITS RULE TO DRS. SCOTT AND IG-IZEVBEKHAI

138.   After Walgreens refused them religious accommodations on the purported ground that Minnesota requires all pharmacists to dispense gender-transition drugs regardless of religious objections, Dr. Scott, on behalf of

---

[5] *Frequently Asked Questions*, Minn. Bd. of Pharmacy, https://mn.gov/boards/pharmacy/public/frequentlyaskedquestions.jsp.

[6] *See, e.g., Salier v. Walmart, Inc.,* 76 F.4th 796 (8th Cir. 2023).

herself and Dr. Ig-Izevbekhai, engaged in extensive correspondence with the Board seeking clarification on this issue.

139.   In that correspondence, the Board confirmed that pharmacists in Minnesota are not required to fill prescriptions for drugs intended to cause abortions.

140.   As to religious objections to filling prescriptions for gender-transition drugs, however, the Board ultimately informed Dr. Scott that it "is unable to provide guidance on this issue" but would evaluate it "on a case by case basis."

## CAUSES OF ACTION

### Count One: Declaratory Judgment
### (Minn. Stat. §555.01; 28 U.S.C. §2201)
### By Dr. Scott, against the Board Defendants
### By Dr. Ig-Izevbekhai, against all Defendants

141.   Minn. R. 6800.2250, subp. 1(C) requires that pharmacists fill prescriptions "that may reasonably be expected to be" filled.

142.   The Board allows pharmacists to decline to fill prescriptions for "personal reasons" involving their religious or ethical convictions.

143.   Consistent with that interpretation, both federal and Minnesota law require religious accommodations for employees in the workplace, and protect conscience rights in various contexts.

144.   Therefore,   in   any   geographical   community   where   other

pharmacists are available immediately or within the next business day, reasonable patients and customers would not expect a Minnesota pharmacist to fill a non-emergency prescription in violation of the pharmacist's religious convictions.

145.    Medications taken for the purpose of gender transition by their nature take extended periods of time to have effect, and cannot be used to treat any emergency condition.

146.    Therefore, Title VII and the Minnesota Human Rights Act require Minnesota employers to offer reasonable accommodations to pharmacists with sincere religious objections to dispensing or compounding drugs for the purpose of gender transitions, in any community where other pharmacists are available.

147.    At all relevant times and currently, Drs. Ig-Izevbekhai and Scott have sincere religious objections to dispensing or compounding drugs for the purpose of gender transitions, and they wish to work in communities where other pharmacists are available.

148.    Drs. Ig-Izevbekhai and Scott both have suffered and continue to face significantly diminished career prospects due to employers' belief that the Board prohibits religious accommodations for pharmacists with religious convictions and practices like theirs.

149.    Plaintiffs requested that the Board clarify this matter, and the

29

Board refused. As a result, an actual controversy exists between Plaintiffs and the Board on this matter.

150.   Walgreens took and continues to take severe adverse employment actions against Dr. Ig-Izevbekhai due to Walgreens' belief that the Board prohibits religious accommodations for pharmacists with religious beliefs and practices like hers. As a result, an actual controversy exists between Dr. Ig-Izevbekhai and Walgreens on this matter.

### Count Two: Free Exercise of Religion (42 U.S.C. §§1983, 1988)<br>By both Plaintiffs, against the Board Defendants

151.   In the alternative, to any extent that any statute, rule, or requirement administered or enforced by the Board does require Plaintiffs to dispense or compound drugs to be used for gender transitions in violation of their religious convictions, the Board Defendants are engaging in an ongoing infringement of Plaintiffs' free exercise of religion.

152.   This infringement violates the First Amendment regardless of whether the Board's requirement that pharmacists violate their religious practices and beliefs by dispensing drugs is neutral or generally applicable.

153.   In any event, however, the requirement is *not* neutral or generally applicable. The Board does not require pharmacists to dispense drugs when they find it problematic for insurance or economic reasons, or based on their professional judgment. Thus, any requirement that pharmacists dispense

drugs in violation of their religious convictions and practices is a targeting or singling out of religious practice.

154.   There is no cognizable government interest in providing drugs for the purpose of gender transitions. No drugs are currently approved for that purpose; all prescriptions for that purpose are "off-label" prescriptions of drugs approved for other purposes. Such off-label use of these drugs has major side effects and little is known about its long-term complications. Moreover, there are effective non-pharmaceutical treatments whose side effects and complications are far less extensive, if not nonexistent.

155.   Even if there were a government interest in providing such drugs, forcing pharmacists with religious objections to dispense them bears virtually no relationship to that interest. There are thousands of pharmacists in Minnesota, the majority of whom have no religious objections to dispensing such drugs, and such drugs do not need to be dispensed on an emergency basis. Moreover, pharmaceuticals can increasingly be distributed over long distances. It is nearly certain that Minnesota pharmacists with religious objections to dispensing such drugs could be accommodated without depriving even a single person of the opportunity to receive them.

156.   The Board's violation of Plaintiffs' free exercise rights has grievously and irreparably injured them, and continues to do so, by severely limiting their ability to work in their chosen field, by causing them lost wages, by

inflicting reputational and emotional harm, and in numerous other ways.

157.   In the absence of declaratory and injunctive relief against the Board defendants, this irreparable harm will continue.

### Count Three: Minn. Const. art. I, §16, Free Exercise
### By both Plaintiffs, against the Board Defendants

158.   In the alternative to Count One, to any extent that any statute, rule, or requirement administered or enforced by the Board does require Plaintiffs to dispense or compound drugs to be used for gender transitions in violation of their religious convictions, the Board Defendants are engaging in an ongoing violation of Plaintiffs' right to the free exercise of religion by refusing to permit any religious accommodations for pharmacists.

159.   It would be fully consistent with public safety for the Board to permit a religious accommodation to pharmacists with religious beliefs like Plaintiffs', as demonstrated by Plaintiffs' safe practice of pharmacy for decades. Assuming that public safety suggests that gender-transition drugs be available, there are thousands of pharmacists in Minnesota, the majority of whom have no religious objections to dispensing such drugs, and such drugs do not need to be dispensed on an emergency basis. Moreover, pharmaceuticals can increasingly be distributed over long distances. It is nearly certain that Minnesota pharmacists with religious objections to dispensing such drugs could be accommodated without depriving even a single person of the opportunity to receive

them.

160.   The Board's violation of Plaintiffs' free exercise rights has grievously and irreparably injured them, and continues to do so, by severely limiting their ability to work in their chosen field, by causing them lost wages, by inflicting reputational and emotional harm, and in numerous other ways.

161.   In the absence of declaratory and injunctive relief against the Board defendants, this irreparable harm will continue.

### Count Four: Declaratory Judgment
### (Minn. Stat. §555.01; 28 U.S.C. §2201)
### By Dr. Ig-Izevbakhai against all Defendants

162.   Minn. R. 6800.2250, subp. 1(C) requires that pharmacists "compound or dispense prescription drug orders that may reasonably be expected to be" filled.

163.   Neither this rule nor any other Minnesota law creates an obligation for any pharmacist to administer vaccines.

164.   In the alternative, to the extent that the Board does require pharmacists to administer vaccines, it allows pharmacists to decline to do so for "personal reasons" involving their religious or ethical convictions.

165.   Consistent with that interpretation, both federal and Minnesota law require religious accommodations for employees in the workplace, and protect conscience rights in various contexts. Consistently, in any geographical community where other professionals are available to administer vaccines,

reasonable patients and customers would not expect a Minnesota pharmacist to provide a vaccine in violation of the pharmacist's religious convictions.

166. Vaccines by their nature usually take extended periods of time to have effect and are rarely used to treat an emergency condition.

167. Vaccines are also widely available not just at pharmacies but also doctor's offices, hospitals, and urgent care clinics.

168. Therefore, Title VII and the Minnesota Human Rights Act require Minnesota employers to offer reasonable accommodations to pharmacists with sincere religious objections to administering vaccines made from fetal tissues, in any community where other avenues for vaccination are widely available.

169. At all relevant times and currently, Dr. Ig-Izevbekhai has sincere religious objections to administering vaccines made from fetal tissues, and seeks to work in communities where other pharmacists or vaccination providers are available.

170. Walgreens took and continues to take severe adverse employment actions against Dr. Ig-Izevbekhai due to Walgreens' belief that the Board prohibits religious accommodations for pharmacists like her. As a result, an actual controversy exists between Dr. Ig-Izevbekhai and Defendants on this matter.

**Count Five: Free Exercise of Religion (42 U.S.C. §§1983, 1988)
By Dr. Ig-Izevbekhai, against the Board Defendants**

171. In the alternative to Count Four, to any extent that any statute,

rule, or requirement administered or enforced by the Board does require Dr. Ig-Izevbekhai to administer vaccines made with fetal tissues in violation of her religious convictions, the Board Defendants are engaging in an ongoing infringement of Dr. Ig-Izevbekhai's free exercise of religion.

172.    This infringement violates the First Amendment regardless of whether the Board's requirement that pharmacists violate their religious practices and beliefs by administering vaccines is neutral or generally applicable.

173.    In any event, however, the requirement is *not* neutral or generally applicable.  The Board does not require pharmacies to carry any, and certainly not all, vaccines. Nor does the Board prohibit pharmacies or pharmacists from administering vaccines for insurance, economic, or professional-judgment reasons. Thus, any requirement that pharmacists administer vaccines in violation of their religious convictions and practices is a targeting or singling out of religious practice.

174.    Forcing pharmacists with religious objections to administer these vaccines bears virtually no relationship to the government's interest in ensuring vaccination. There are thousands of pharmacists in Minnesota, in addition to countless other doctors, nurses, physician's assistants, and other medical providers, the majority of whom have no religious objections to administering such vaccines, and most vaccines do not need to be dispensed on an emergency basis. It is nearly certain that Minnesota pharmacists with religious objections

to administering such vaccines could be accommodated without depriving even a single person of the opportunity to receive them.

175.    The Board's violation of Dr. Ig-Izevbekhai's free exercise rights has grievously and irreparably injured her, and continues to do so, by severely limiting her ability to work in her chosen field, causing her lost wages, inflicting reputational and emotional harm, and in numerous other ways.

176.    In the absence of declaratory and injunctive relief against the Board defendants, this irreparable harm will continue.

### Count Six: Minn. Const. art. I, §16, Free Exercise<br>By Dr. Ig-Izevbekhai, against the Board Defendants

177.    In the alternative to Count Four, to any extent that any statute, rule, or requirement administered or enforced by the Board does require Dr. Ig-Izevbekhai to administer vaccines made with fetal tissues in violation of her religious convictions, the Board Defendants are engaging in an ongoing infringement of Dr. Ig-Izevbekhai's free exercise of religion by refusing to permit any religious accommodations for pharmacists.

178.    It would be fully consistent with public safety for the Board to permit a religious accommodation to pharmacists with religious beliefs like Dr. Ig-Izevbekhai's, as demonstrated by Dr. Ig-Izevbekhai's safe practice of pharmacy for decades. There are thousands of pharmacists in Minnesota, in addition to countless other doctors, nurses, physician's assistants, and other medical

providers, the majority of whom have no religious objections to administering such vaccines, and most vaccines do not need to be dispensed on an emergency basis. It is nearly certain that Minnesota pharmacists with religious objections to administering such vaccines could be accommodated without depriving even a single person of the opportunity to receive them.

179.    The Board's violation of Dr. Ig-Izevbekhai's free exercise rights has grievously and irreparably injured her, and continues to do so, by severely limiting her ability to work in her chosen field, by causing her lost wages, by inflicting reputational and emotional harm, and in numerous other ways.

180.    In the absence of declaratory and injunctive relief against the Board defendants, this irreparable harm will continue.

### Count Seven: Title VII Religious Discrimination
### By Dr. Ig-Izevbekhai, against Walgreens

181.    Dr. Ig-Izevbekhai holds sincere religious beliefs and follows sincere religious practices that preclude her from dispensing certain medications, and taking certain other actions as described above.

182.    Dr. Ig-Izevbekhai informed Walgreens of those beliefs and practices, and requested a reasonable accommodation.

183.    Walgreens impermissibly failed and refused to accommodate Dr. Ig-Izevbekhai. In doing so, it also failed to initiate the interactive process regarding Dr. Ig-Izevbekhai's accommodation request.

37

184.   In particular, Walgreens falsely claimed that the Minnesota Board of Pharmacy requires pharmacists to dispense gender-transition medications in spite of their religious objections, when in fact the Board imposes no such requirement, and to the extent it does, the requirement is invalid under the federal and Minnesota Constitutions.

185.   Walgreens therefore required Dr. Ig-Izevbekhai to dispense or compound drugs for the purpose of facilitating gender transitions, and took adverse employment action against her as a result of her unwillingness to do so.

186.   To any extent that Walgreens now claims it additionally took adverse employment action against Dr. Ig-Izevbekhai because she did not agree to sell tobacco products and alcoholic beverages, and/or because she did not agree to administer certain vaccines, she maintains sincere religious practices of refraining from these actions as well, and she requested and was denied accommodation from Walgreens for these matters as well.

187.   Dr. Ig-Izevbekhai filed charges with the EEOC complaining of these actions on March 13, 2024, and received a right-to-sue letter on May 27, 2025.

188.   Walgreens's discrimination against and failure to accommodate Dr. Ig-Izevbekhai's sincere religious practices has grievously and irreparably injured her, and continues to do so, by severely limiting her ability to work in

her chosen field, by causing her lost wages, by inflicting reputational and emotional harm, and in numerous other ways.

189.   In the absence of declaratory and injunctive relief against Walgreens, this irreparable harm will continue.

## Count Eight: Minnesota Human Rights Act Religious Discrimination By Dr. Ig-Izevbekhai, against Walgreens

190.   Dr. Ig-Izevbekhai holds sincere religious beliefs and follows sincere religious practices that preclude her from dispensing certain medications, and taking certain other actions as described above.

191.   Dr. Ig-Izevbekhai informed Walgreens of those beliefs and practices, and requested a reasonable accommodation.

192.   Walgreens impermissibly failed and refused to accommodate Dr. Ig-Izevbekhai by falsely declaring that to do so would impose an undue hardship on Walgreens. In doing so, it also failed to initiate the interactive process regarding Dr. Ig-Izevbekhai's accommodation request.

193.   In particular, Walgreens falsely claimed that the Minnesota Board of Pharmacy requires pharmacists to dispense gender-transition medications in spite of their religious objections, when in fact the Board imposes no such requirement, and to the extent it does, the requirement is invalid under the federal and Minnesota Constitutions. Walgreens therefore required Dr. Ig-Izevbekhai to dispense or compound drugs for the purpose of facilitating

gender transitions, and took adverse employment action against her as a result of her unwillingness to do so.

194.  To any extent that Walgreens now claims it additionally took adverse employment against Dr. Ig-Izevbekhai because she did not agree to sell tobacco products and alcoholic beverages, and/or because she did not agree to administer certain vaccines, she maintains sincere religious practices of refraining from these actions as well, and she requested and was denied accommodation from Walgreens for these matters as well.

195.  Dr. Ig-Izevbekhai filed charges with the EEOC complaining of these actions on March 13, 2024, and received a right-to-sue letter on May 27, 2025.

196.  Walgreens's discrimination against and failure to accommodate Dr. Ig-Izevbekhai's sincere religious practices has grievously and irreparably injured her, and continues to do so, by severely limiting her ability to work in her chosen field, by causing her lost wages, by inflicting reputational and emotional harm, and in numerous other ways.

197.  In the absence of declaratory and injunctive relief against Walgreens, this irreparable harm will continue.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court grant relief as follows:

A.    A declaration that no Minnesota law or rule requires them to

dispense or compound drugs for the purpose of gender transitions when doing so would violate their sincerely held religious beliefs;

B.      A declaration that, to the extent Minnesota law or the Board Defendants purport to require Plaintiffs to dispense or compound drugs for the purpose of gender transitions, such requirement violates 42 U.S.C. §1983 and Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Minnesota Constitution;

C.      A preliminary and then permanent injunction preventing the Board Defendants from disciplining Plaintiffs for refusing to dispense prescriptions that are used to attempt to change, alter, or mutilate gender or are used to attempt gender transition;

D.      A declaration that no Minnesota law or rule requires Dr. Ig-Izevbekhai to administer vaccines made with fetal tissue;

E.      A declaration that, to the extent Minnesota law or the Board Defendants purport to require Dr. Ig-Izevbekhai to administer vaccines made with fetal tissue, such requirement violates 42 U.S.C. §1983 and Dr. Ig-Izevbekhai's rights under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Minnesota Constitution;

F.      A declaratory judgment that, to the extent Minn. R. 6800.2250,

41

subp. C requires Dr. Ig-Izevbekhai to administer vaccines made with fetal tissue, it is unconstitutional as applied to Dr. Ig-Izevbekhai;

G.    A preliminary and then permanent injunction preventing the Board Defendants from disciplining Dr. Ig-Izevbekhai for refusing to administer vaccines made with fetal tissue;

H.    A declaratory judgment that Defendant Walgreens violated Dr. Ig-Izevbekhai's rights under Title VII and the Minnesota Human Rights Act;

I.    An award of actual, nominal, and general damages in favor of Dr. Ig-Izevbekhai because of Walgreen's violations of Title VII and the Minnesota Human Rights Act, in an amount to be proven at trial.;

J.    An award of back pay, front pay, treble damages and statutory penalties, interest, emotional distress and pain and suffering, damages to compensate for dignitary and reputational harm to Dr. Ig-Izevbekhai, and any other damages or penalties available at law;

K.    Reinstatement to Dr. Ig-Izevbekhai's former position at Walgreens, with wage and benefit increases consistent with what an employee in her position would have received during her illegal demotion;

L.    An award of punitive damages because of Walgreen's intentional discrimination against Dr. Ig-Izevbekhai with malice and reckless indifference to her rights under Title VII and the Minnesota Human Rights Act;

M.     Reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. §1988 and Minn. Stat. §363A.33, or other applicable law; and

N.     All and any further relief to which Plaintiffs may be entitled.

O.     A trial by jury of all such matters properly tried as such is requested.

Respectfully submitted,

**UPPER MIDWEST LAW CENTER**

Dated: August 22, 2025

*s/ Nicholas J. Nelson*
Douglas P. Seaton (#127759)
Nicholas J. Nelson (#391984)
Alexandra K. Howell (#504850)
12600 Whitewater Drive
Suite 140
Minnetonka, MN 55343
Doug.Seaton@umlc.org
Nicholas.Nelson@umlc.org
Allie.Howell@umlc.org
(612) 428-7000

**CROSSCASTLE PLLC**

Samuel W. Diehl (#388371)
Ryan D. Wilson (#400797)
2140 4th Avenue North
Anoka, MN 55303
Sam.Diehl@crosscastle.com
Ryan.Wilson@crosscastle.com
(612) 429-8100

*Attorneys for Plaintiffs*

43